PAUL J. BEARD II (State Bar No. 210563)
**FISHERBROYLES LLP**
4470 W. Sunset Blvd., Suite 93165
Los Angeles, CA 90027
Telephone: (818) 216-3988
Facsimile: (213) 402-5034
E-mail: paul.beard@fisherbroyles.com

Attorney for Plaintiff FELIX MENDELSON, as trustee for
THE SHTAIMAN FAMILY TRUST

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FELIX MENDELSON, as trustee for THE SHTAIMAN FAMILY TRUST, <br><br> Plaintiff, <br><br> v. <br><br> COUNTY OF SAN MATEO, and DOES 1 to 50, inclusive, <br><br> Defendants. | Case No.: 3:20-cv-5696 <br><br> **COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS (42 U.S.C. § 1983)** <br><br> DEMAND FOR JURY TRIAL |

Plaintiff FELIX MENDELSON, as trustee for THE SHTAIMAN FAMILY TRUST, by and through his undersigned counsel, brings this Complaint against Defendant COUNTY OF SAN MATEO ("County"), and alleges as follows:

**PARTIES**

1. Plaintiff FELIX MENDELSON, as trustee for THE SHTAIMAN FAMILY TRUST (hereinafter, "Mr. Mendelson") is the owner of four vacant lots in the County of San Mateo (APNs 047-111-210 and 047-111-350). Although Mr. Mendelson is ready, willing, and able to build on his lots, San Mateo County laws and regulations categorically preclude all developmental and economically beneficial and viable use, rendering his lots economically idle. Having taken or seized his lots, the County owes Mr. Mendelson just compensation and/or damages, as well as his attorneys' fees and costs of suit.

2. Defendant COUNTY OF SAN MATEO is a political subdivision of the State of

California. The County has adopted and enforced laws that deprive Mr. Mendelson of all developmental and economically beneficial and viable use of his lots.

3.     The true names and capacities of Defendant DOES 1 through 50, inclusive, are unknown to Mr. Mendelson, who therefore sues them by such fictitious names pursuant to California Code of Civil Procedure section 474. Mr. Mendelson is informed and believes, and on that basis alleges, that each of the fictitiously named Defendants is responsible in some manner for the acts and occurrences herein alleged, and that his injury was caused by said Defendants.

## JURISDICTION AND VENUE

4.     The claims in this action arise from unconstitutional action taken by Defendant County of San Mateo, a state actor, in violation of the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. This Court has original jurisdiction over this action under 42 U.S.C. § 1983, 28 U.S.C. § 1331, and 28 U.S.C. § 1343. The Court may grant declaratory relief under 28 U.S.C. § 2201.

5.     Venue in this Court is proper under 28 U.S.C. § 1391, because Defendant County of San Mateo and the property that is the subject of this action are situated in this judicial district.

## GENERAL ALLEGATIONS

### *Legal Allegations*

6.     The Coastal Act requires that each local government lying, in whole or in part, within the coastal zone prepare a Local Coastal Program (LCP) for that portion of the coastal zone under the local government's jurisdiction. (Pub. Res. Code § 30500(a).) An LCP consists of two principal components: a Land Use Plan (LUP) and "implementing actions," such as zoning ordinances and maps. (*Id.* §§ 30108.6, § 30108.4, 30108.5.)

7.     The California Coastal Commission, the state agency responsible for administration of the Coastal Act, is responsible for reviewing and certifying, as consistent with the Act, all LCPs before they go into effect. Once an LCP is certified and adopted, the local government is responsible for approving Coastal Development Permits (CDPs) for projects within their boundaries, and the Coastal Commission retains very limited appeal jurisdiction over certain approvals. A local government decision to *deny* a project is final and non-appealable to the Coastal Commission. (Pub. Res. Code § 30603.)

8.      In late 1980, the San Mateo County Board of Supervisors and the Coastal Commission approved the LCP. In April 1981, the County assumed responsibility for implementing the California Coastal Act in the unincorporated area of San Mateo County. All development in the unincorporated coastal areas of the County, including construction of a single-family home, requires CDP approval from the County. For a CDP to be issued, the development must comply with the policies of the County's LCP.

9.      The County's LCP includes Local Coastal Program Policies (LCP Policies) governing an array of land-use issues, including sensitive habitats. A true and correct copy of the Sensitive Habitats component of the LCP Policies is attached, and incorporated by reference, as Exhibit A.

10.     Sensitive habitats including "riparian corridors," which are defined "by the 'limit of riparian vegetation' (i.e., a line determined by the association of plant and animal species normally found near streams, lakes and other bodies of freshwater: red alder, jaumea, pickleweed, big leaf maple, narrow-leaf cattail, arroyo willow, broadleaf cattail, horsetail, creek dogwood, black cottonwood, and box elder)." (LCP Policy 7.7.) Riparian corridors "must contain at least a 50% cover of some combination of the plants listed." (LCP Policy 7.7.)

11.     As with all sensitive habitats, the County designates riparian corridors as "requiring protection" on official maps that are part of the LCP. (LCP Policy 7.8.) The County also designates legally protected "buffer zones" on both sides of mapped riparian corridors. (LCP Policy 7.11.)

12.     On property within a riparian corridor, the law permits only the following uses: "(1) education and research, (2) consumptive uses as provided for in the Fish and Game Code and Title 14 of the California Administrative Code, (3) fish and wildlife management activities, (4) trails and scenic overlooks on public land(s), and (5) necessary water supply projects." (LCP Policy 7.9(a).) If "no feasible or practicable alternative exists," the law allows the following uses: "(1) stream dependent aquaculture, provided that non-stream dependent facilities locate outside of corridor, (2) flood control projects, including selective removal of riparian vegetation, where no other method for protecting existing structures in the floodplain is feasible and where such protection is necessary for public safety or to protect existing development, (3) bridges when supports are not in significant conflict with corridor resources, (4) pipelines, (5) repair or maintenance of roadways or road crossings, (6) logging

operations which are limited to temporary skid trails, stream crossings, roads and landings in accordance with State and County timber harvesting regulations, and (7) agricultural uses, provided no existing riparian vegetation is removed, and no soil is allowed to enter stream channels." (LCP Policy 7.9(b).)

13.     Within buffer zones, the LCP permits only the following uses: "(1) uses permitted in riparian corridors; (2) residential uses on existing legal building sites, set back 20 feet from the limit of riparian vegetation, only if no feasible alternative exists, and only if no other building site on the parcel exists; (3) on parcels designated on the LCP Land Use Plan Map: Agriculture, Open Space, or Timber Production, residential structures or impervious surfaces only if no feasible alternative exists; (4) crop growing and grazing consistent with Policy 7.9; (5) timbering in 'streamside corridors' as defined and controlled by State and County regulations for timber harvesting." (LCP Policy 7.12.) In addition, "no new residential parcels shall be created whose only building site is in the buffer area." (LCP Policy 7.12.)

14.     The LCP does not give the County or Coastal Commission any discretion to approve a project in conflict with the LCP policies on Sensitive Habitats. The LCP does not provide for a variance or other exception to the strict prohibition on developmental or economically viable or beneficial use of property located in a riparian corridor and associated buffer zone.

15.     On information and belief, the County accepts and processes permit applications for the residential development of properties even if located in riparian corridors and/or buffer zones. A landowner's attempt to obtain a CDP to build on such property entails a costly, two-step process. Where no question or dispute exists that a property lies entirely within a riparian corridor and/or buffer zone, the outcome of that two-step process, which costs an applicant many tens of thousands of dollars, is certain denial of the right to build.

16.     On information and belief, in the first step, before the County will even accept a CDP application to develop property within a riparian corridor, the County requires an *initial* CDP in order to allow the preliminary work needed to put a development plan together. The applicant must hire a biologist prior to hiring a surveyor to survey the land or doing any other preliminary work. Whenever such work may disturb the land or require clearing vegetation (as it would here), a qualified biologist

is needed to map and describe the type and extent of the vegetation that must be removed to complete the surveying/planning work, evaluate the potential impacts to sensitive plant and animal species and their habitats, and recommend measures to avoid and minimize such impacts. If the property is surrounded by and/or covered in riparian vegetation (as it is here), then the surveyor's work requires vegetation clearance, which itself requires the applicant to first obtain a CDP from the County. A County-approved CDP would be appealable to the Coastal Commission.  On information and belief, the County requires other permits from other agencies, including the California Department of Fish and Wildlife and the County Department of Public Works, before surveying and mapping may commence. Thus, the first step alone—before an applicant can even submit a CDP application to construct a project—involves the expenditure of many tens of thousands of dollars and many months, if not years, to complete.

17.     Upon completion of the first step, the applicant moves on to the second step of submitting a CDP application to the County to build on his property. If, as in this case, the property, as well as the only legal access to it, is covered in riparian vegetation and therefore lies inside a riparian corridor and/or buffer zone, the LCP categorically prohibits the construction of any permanent road or residence, and the County must deny the permit application. Permit denials are not appealable to the Coastal Commission.

18.     The County has created an informal process whereby a property owner can request from County staff a so-called "takings analysis" without submitting specific development plans. On information and belief, the County staff provides an analysis as to whether development will be allowed, and whether prohibiting development effects a compensable taking.

### ***Factual Allegations***

19.     As trustee for The Shtaiman Family Trust, Mr. Mendelson owns four vacant lots in the residential El Granada area of San Mateo County. The lots are bounded to the west by Montecito Avenue (an unbuilt "paper" street running approximately north-south), to the east by largely developed lots and Escalona Avenue (running approximately west-east), to the north by vacant lots, and to the south by San Carlos Avenue (running approximately west-east).

/ / /

20.     The length of Montecito abutting the lots is completely within the middle of the riparian corridor. Montecito may be accessed from the south by San Carlos and from the north by Escalona, both of which run through the middle of the riparian corridor. The relevant portions of Montecito, Escalona, and San Carlos Avenues are legal roads having been duly accepted by the San Mateo Board of Supervisors and never having been abandoned. But given the unbuilt portions of Montecito, San Carlos, and Escalona Avenues, which lead to the lots on paper only, there currently is no physical access to the lots via those roads (or any other road).

21.     The lots are located in the R-1 zoning district, which authorizes one single-family home per lot. The lots are among the few in the El Granada area that remain vacant. Almost all other properties in the area are fully developed with single-family homes, as authorized by the R-1 zoning district.

22.     Lots 4 through 7, as well as the paper avenues leading to them, are covered completely by riparian vegetation. Below is an aerial image pulled from Google Maps that shows the location of Lots 4 through 7, delineated by a super-imposed black rectangle. The aerial image is an accurate depiction of the current condition of the site.



COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS

23.     Lots 5, 6, and 7, as well as the sections of the paper avenues leading to those lots, lie entirely within the County's "Montecito Riparian Corridor" as reflected in the County's official map adopted almost 15 years ago (a part of the LCP). In that map, Lot 4 lies almost completely within the Montecito Riparian Corridor, with a small portion located in the corridor's buffer zone. Attached as Exhibit B, and incorporated by reference herein, is a true and correct copy of the County's Montecito Riparian Corridor Map, showing Mr. Mendelson's lots labeled as "35" and "21."

24.     Given the lots' location in the Montecito Riparian Corridor and buffer zone, and the absence of physical access to those lots except through the riparian corridor, Mr. Mendelson's lots are unbuildable under the LCP for *any* developmental or economically viable or beneficial use, including single-family homes as allowed by the R-1 zoning district.

25.     Any attempt to obtain a CDP from the County for the construction of single-family homes on Lots 4 through 7, and to build out the avenues allowing access to those lots, would be futile and cost prohibitive.

26.     First, Mr. Mendelson would need a CDP from the County  allowing the preliminary work and survey needed to prepare a development plan. Applying for the CDP would require Mr. Mendelson to hire a biologist to complete a survey and map of the avenues and lots because cutting a pathway up the avenues to the lots for surveying and mapping would remove vegetation and disturb the land. That alone would require Mr. Mendelson to submit a CDP application to the County for authorization to clear protected vegetation through to and inside his lots—and all for the sole purpose of establishing what is already known and undisputed: the lots and all road access to them are covered in legally protected, riparian vegetation and are inside the Montecito Riparian Corridor.

27.     Assuming eventual completion of step one, Mr. Mendelson would then have to proceed to step two: submit a second CDP application to the County for actual construction of single-family homes on the lots and street improvements. Again, given the undisputed topography completely covered in riparian vegetation, the LCP would require denial of a permit to build.

28.     Steps one and two would cost Mr. Mendelson many tens of thousands of dollars, and months if not years, to complete. And the culmination of those costly and time-consuming efforts would be denial of a CDP to construct the necessary roads to the lots and to construct homes—or, for

that matter, to make *any* developmental or economically viable or beneficial use of the lots. On these facts, it would be futile and unjust to force Mr. Mendelson to apply for, and be denied, a development permit.

29.     On June 3, 2019, Mr. Mendelson submitted a request that County staff perform a takings analysis. The request represented an opportunity for the County, pursuant to a procedure it created and made available to the public, to assess whether and the extent to which Lots 4 through 7 could be developed—and if they could not, whether the LCP's prohibition on residential development effected a compensable taking of those lots.

30.     Despite Mr. Mendelson's repeated attempts to obtain an analysis over the course of the following six months, the County never provided the takings analysis. As of the date of this Complaint, the County still has not provided the analysis. The County's silence in the face of Mr. Mendelson's request definitively and finally establishes the County's positions that (1) Mr. Mendelson cannot build on his lots, and (2) the County does not believe just compensation or any other monetary compensation is due to him.

31.     Mr. Mendelson is ready, willing, and able to construct homes on his four lots. But he is categorically barred from doing so by County law.

## FIRST CLAIM FOR RELIEF

### (Uncompensated Taking in Violation of U.S. Const. amend. V, XIV; 42 U.S.C. § 1983)

32.     Mr. Mendelson realleges and incorporates by reference herein the preceding paragraphs in their entirety.

33.     The Takings Clause of the Fifth Amendment to the United States Constitution, made applicable to state and local governments via the Fourteenth Amendment, bars the taking of private property for a public use without just compensation. (U.S. Const. amends. X, XIV.)

34.     A categorical taking occurs when the government deprives an owner of all "developmental or economically beneficial" or "viable" use of his property, leaving it "economically idle." (*Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1018, 1019, 1025 n.12.)

35.     Under 42 U.S.C. § 1983, any person may vindicate, and seek redress of the violation of, his federal constitutional rights in state or federal court.

36.     The LCP prohibits all developmental or economically viable or beneficial use on property within the Montecito Riparian Corridor and its buffer zone.

37.     Mr. Mendelson owns Lots 4 through 7, which are within the Montecito Riparian Corridor and its buffer zone. Those lots at all times have been, and continue to be, completely covered in protected riparian vegetation. There is no area of any of the lots that lies outside the riparian corridor or buffer zone.

38.     Under the LCP, Mr. Mendelson is precluded from making any developmental or economically viable or beneficial use of Lots 4 through 7.

39.     There are no administrative remedies to exhaust or, if there are, it would be futile for Mr. Mendelson to exhaust them. The law clearly prohibits all developmental or economically viable or beneficial use of Lots 4 through 7, without exception. Under the LCP, the County has no discretion to allow such use, when in violation with the LCP policies on Sensitive Habitats. The LCP contains no variance provision or other mechanism that would allow an exception to the prohibition. Further, applying for a CDP to construct single-family homes on these lots (or to make *any* developmental or economically beneficial or viable use thereof) would be futile and cost-prohibitive, as discussed above.

40.     Given the prohibition on all economically viable and beneficial use of Lots 4 through 7, the County has taken those lots without compensation in violation of the Fifth Amendment.

41.     Mr. Mendelson is entitled to recovery of his attorneys' fees and costs of suit for vindication of his constitutional rights, pursuant to 42 U.S.C. § 1988 and any other applicable law.

## **SECOND CLAIM FOR RELIEF**

### **(Seizure of Property In Violation of U.S. Const. amend. V, XIV; 42 U.S.C. § 1983)**

42.     Mr. Mendelson realleges all preceding paragraphs as if fully set forth herein.

43.     The Fourth Amendment to the U.S. Constitution, made applicable to state and local governments via the Fourteenth Amendment, prohibits unreasonable seizures of property. (U.S. Const. amend. IV, XIV.)

44.     By precluding all development and use of Mr. Mendelson's lots, the County has seized his property arbitrarily and capriciously, and without any legitimate public purpose, in violation of the Fourth Amendment.

45.   Mr. Mendelson is entitled to recovery of his attorneys' fees and costs of suit for vindication of his constitutional rights, pursuant to 42 U.S.C. § 1988 and any other applicable law.

## **RELIEF SOUGHT**

WHEREFORE, Mr. Mendelson prays for judgment as follows:

46.   A declaration that the County has taken Lots 4 through 7, without payment of just compensation, in violation of the Fifth Amendment to the United States Constitution;

47.   A declaration that the County has unreasonably seized Lots 4 through 7, in violation of the Fourth Amendment to the United States Constitution;

48.   An award of just compensation paid by the County to Mr. Mendelson, as trustee for The Shtaiman Family Trust, for the taking of Lots 4 through 7, in an amount to be determined according to proof at trial;

49.   An award of damages paid by the County to Mr. Mendelson for the unconstitutional seizure of Lots 4 through 7, in an amount to be determined according to proof at trial;

50.   An award of reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable provision of law; and

51.   Such other and further relief as the Court deems appropriate and just.

52.   Mr. Mendelson hereby makes a demand for a jury trial, pursuant to Local Rule 3-6(a) and Fed. R. Civ. P. 38(b).

DATED: August 14, 2020          Respectfully submitted,


/s/ Paul J. Beard II

Paul J. Beard II (SBN: 210563)
FISHERBROYLES LLP
4470 W. Sunset Blvd., Suite 93165
Los Angeles, CA 90027
Telephone: (818) 216-3988
Facsimile: (213) 402-5034
E-mail: paul.beard@fisherbroyles.com

*Attorney for Plaintiff FELIX MENDELSON, as trustee for*
*THE SHTAIMAN FAMILY TRUST*

# EXHIBIT A

*COUNTY OF SAN MATEO*

# Local Coastal Program Policies



Pigeon Point Lighthouse Photo by Jitze Couperus

*JUNE 2013*

*PLANNING AND BUILDING DEPARTMENT*

# *SENSITIVE HABITATS COMPONENT*

## GENERAL POLICIES

*7.1   Definition of Sensitive Habitats

Define sensitive habitats as any area in which plant or animal life or their habitats are either rare or especially valuable and any area which meets one of the following criteria:  (1) habitats containing or supporting "rare and endangered" species as defined by the State Fish and Game Commission, (2) all perennial and intermittent streams and their tributaries, (3) coastal tide lands and marshes, (4) coastal and offshore areas containing breeding or nesting sites and coastal areas used by migratory and resident water-associated birds for resting areas and feeding, (5) areas used for scientific study and research concerning fish and wildlife, (6) lakes and ponds and adjacent shore habitat, (7) existing game and wildlife refuges and reserves, and (8) sand dunes.

Sensitive habitat areas include, but are not limited to, riparian corridors, wetlands, marine habitats, sand dunes, sea cliffs, and habitats supporting rare, endangered, and unique species.

7.2   Designation of Sensitive Habitats

Designate sensitive habitats as including, but not limited to, those shown on the Sensitive Habitats Map for the Coastal Zone.

*7.3   Protection of Sensitive Habitats

a.   Prohibit any land use or development which would have significant adverse impact on sensitive habitat areas.

b.   Development in areas adjacent to sensitive habitats shall be sited and designed to prevent impacts that could significantly degrade the sensitive habitats.  All uses shall be compatible with the maintenance of biologic productivity of the habitats.

*7.4   Permitted Uses in Sensitive Habitats

a.   Permit only resource dependent uses in sensitive habitats.  Resource dependent uses for riparian corridors, wetlands, marine habitats, sand dunes, sea cliffs and habitats supporting rare, endangered, and unique species shall be the uses permitted in Policies 7.9, 7.16, 7.23, 7.26, 7.30, 7.33, and 7.44, respectively, of the County Local Coastal Program on March 25, 1986.

b. In sensitive habitats, require that all permitted uses comply with U.S. Fish and Wildlife and State Department of Fish and Game regulations.

7.5 Permit Conditions

a. As part of the development review process, require the applicant to demonstrate that there will be no significant impact on sensitive habitats. When it is determined that significant impacts may occur, require the applicant to provide a report prepared by a qualified professional which provides: (1) mitigation measures which protect resources and comply with the policies of the Shoreline Access, Recreation/Visitor-Serving Facilities and Sensitive Habitats Components, and (2) a program for monitoring and evaluating the effectiveness of mitigation measures. Develop an appropriate program to inspect the adequacy of the applicant's mitigation measures.

b. When applicable, require as a condition of permit approval the restoration of damaged habitat(s) when in the judgment of the Planning Director restoration is partially or wholly feasible.

7.6 Allocation of Public Funds

In setting priorities for allocating limited local, State, or federal public funds for preservation or restoration, use the following criteria: (1) biological and scientific significance of the habitat, (2) degree of endangerment from development or other activities, and (3) accessibility for educational and scientific uses and vulnerability to overuse.

## RIPARIAN CORRIDORS

7.7 Definition of Riparian Corridors

Define riparian corridors by the "limit of riparian vegetation" (i.e., a line determined by the association of plant and animal species normally found near streams, lakes and other bodies of freshwater: red alder, jaumea, pickleweed, big leaf maple, narrow-leaf cattail, arroyo willow, broadleaf cattail, horsetail, creek dogwood, black cottonwood, and box elder). Such a corridor must contain at least a 50% cover of some combination of the plants listed.

7.8 Designation of Riparian Corridors

Establish riparian corridors for all perennial and intermittent streams and lakes and other bodies of freshwater in the Coastal Zone. Designate those corridors shown on the Sensitive Habitats Map and any other riparian area meeting the definition of Policy 7.7 as sensitive habitats requiring protection, except for man-made irrigation ponds over 2,500 sq. ft. surface area.

7.9     Permitted Uses in Riparian Corridors

a.     Within corridors, permit only the following uses:  (1) education and research, (2) consumptive uses as provided for in the Fish and Game Code and Title 14 of the California Administrative Code, (3) fish and wildlife management activities, (4) trails and scenic overlooks on public land(s), and (5) necessary water supply projects.

b.     When no feasible or practicable alternative exists, permit the following uses:  (1) stream dependent aquaculture, provided that non-stream dependent facilities locate outside of corridor, (2) flood control projects, including selective removal of riparian vegetation, where no other method for protecting existing structures in the floodplain is feasible and where such protection is necessary for public safety or to protect existing development, (3) bridges when supports are not in significant conflict with corridor resources, (4) pipelines, (5) repair or maintenance of roadways or road crossings, (6) logging operations which are limited to temporary skid trails, stream crossings, roads and landings in accordance with State and County timber harvesting regulations, and (7) agricultural uses, provided no existing riparian vegetation is removed, and no soil is allowed to enter stream channels.

7.10    Performance Standards in Riparian Corridors

Require development permitted in corridors to:  (1) minimize removal of vegetation, (2) minimize land exposure during construction and use temporary vegetation or mulching to protect critical areas, (3) minimize erosion, sedimentation, and runoff by appropriately grading and replanting modified areas, (4) use only adapted native or non-invasive exotic plant species when replanting, (5) provide sufficient passage for native and anadromous fish as specified by the State Department of Fish and Game, (6) minimize adverse effects of waste water discharges and entrainment, (7) prevent depletion of groundwater supplies and substantial interference with surface and subsurface waterflows, (8) encourage waste water reclamation, (9) maintain natural vegetation buffer areas that protect riparian habitats, and (10) minimize alteration of natural streams.

7.11    Establishment of Buffer Zones

a.     On both sides of riparian corridors, from the "limit of riparian vegetation" extend buffer zones 50 feet outward for perennial streams and 30 feet outward for intermittent streams.

b.     Where no riparian vegetation exists along both sides of riparian corridors, extend buffer zones 50 feet from the predictable high water point for perennial streams and 30 feet from the midpoint of intermittent streams.

7.3

c.    Along lakes, ponds, and other wet areas, extend buffer zones 100 feet from the high water point except for man-made ponds and reservoirs used for agricultural purposes for which no buffer zone is designated.

7.12    Permitted Uses in Buffer Zones

Within buffer zones, permit only the following uses:  (1) uses permitted in riparian corridors; (2) residential uses on existing legal building sites, set back 20 feet from the limit of riparian vegetation, only if no feasible alternative exists, and only if no other building site on the parcel exists; (3) on parcels designated on the LCP Land Use Plan Map:  Agriculture, Open Space, or Timber Production, residential structures or impervious surfaces only if no feasible alternative exists; (4) crop growing and grazing consistent with Policy 7.9; (5) timbering in "streamside corridors" as defined and controlled by State and County regulations for timber harvesting; and (6) no new residential parcels shall be created whose only building site is in the buffer area.

7.13    Performance Standards in Buffer Zones

Require uses permitted in buffer zones to:  (1) minimize removal of vegetation; (2) conform to natural topography to minimize erosion potential; (3) make provisions (i.e., catch basins) to keep runoff and sedimentation from exceeding pre-development levels; (4) replant where appropriate with native and non-invasive exotics; (5) prevent discharge of toxic substances, such as fertilizers and pesticides; into the riparian corridor; (6) remove vegetation in or adjacent to man-made agricultural ponds if the life of the pond is endangered; (7) allow dredging in or adjacent to man-made ponds if the San Mateo County Resource Conservation District certified that siltation imperils continued use of the pond for agricultural water storage and supply; and (8) limit the sound emitted from motorized machinery to be kept to less than 45-dBA at any riparian buffer zone boundary except for farm machinery and motorboats.

## **WETLANDS**

7.14    Definition of Wetland

Define wetland as an area where the water table is at, near, or above the land surface long enough to bring about the formation of hydric soils or to support the growth of plants which normally are found to grow in water or wet ground.  Such wetlands can include mudflats (barren of vegetation), marshes, and swamps. Such wetlands can be either fresh or saltwater, along streams (riparian), in tidally influenced areas (near the ocean and usually below extreme high water of spring tides), marginal to lakes, ponds, and man-made impoundments. Wetlands do not include areas which in normal rainfall years are permanently submerged (streams, lakes, ponds and impoundments), nor marine or estuarine

areas below extreme low water of spring tides, nor vernally wet areas where the soils are not hydric.

In San Mateo County, wetlands typically contain the following plants:  cordgrass, pickleweed, jaumea, frankenia, marsh mint, tule, bullrush, narrow-leaf cattail, broadleaf cattail, pacific silverweed, salt rush, and bog rush.  To qualify, a wetland must contain at least a 50% cover of some combination of these plants, unless it is a mudflat.

7.15   Designation of Wetlands

   a.   Designate the following as wetlands requiring protection:  Pescadero Marsh, Pillar Point Marsh (as delineated on Map 7.1), marshy areas at Tunitas Creek, San Gregorio Creek, Pomponio Creek and Gazos Creek, and any other wetland meeting the definition in Policy 7.14.

   b.   At the time a development application is submitted, consider modifying the boundary of Pillar Point Marsh (as delineated on Map 7.1) if a report by a qualified professional, selected jointly by the County and the applicant, can demonstrate that land within the boundary does not meet the definition of a wetland.

7.16   Permitted Uses in Wetlands

Within wetlands, permit only the following uses:  (1) nature education and research, (2) hunting, (3) fishing, (4) fish and wildlife management, (5) mosquito abatement through water management and biological controls; however, when determined to be ineffective, allow chemical controls which will not have a significant impact, (6) diking, dredging, and filling only as it serves to maintain existing dikes and an open channel at Pescadero Marsh, where such activity is necessary for the protection of pre-existing dwellings from flooding, or where such activity will enhance or restore the biological productivity of the marsh, (7) diking, dredging, and filling in any other wetland only if such activity serves to restore or enhance the biological productivity of the wetland, (8) dredging man-made reservoirs for agricultural water supply where wetlands may have formed, providing spoil disposal is planned and carried out to avoid significant disruption to marine and wildlife habitats and water circulation, and (9) incidental public service purposes, including, but not limited to, burying cables and pipes or inspection of piers and maintenance of existing intake and outfall lines.

7.17   Performance Standards in Wetlands

Require that development permitted in wetlands minimize adverse impacts during and after construction.  Specifically, require that:  (1) all paths be elevated (catwalks) so as not to impede movement of water, (2) all construction takes place during daylight hours, (3) all outdoor lighting be kept at a distance away

from the wetland sufficient not to affect the wildlife, (4) motorized machinery be kept to less than 45-dBA at the wetland boundary, except for farm machinery, (5) all construction which alters wetland vegetation be required to replace the vegetation to the satisfaction of the Planning Director including "no action" in order to allow for natural reestablishment, (6) no herbicides be used in wetlands unless specifically approved by the County Agricultural Commissioner and State Department of Fish and Game, and (7) all projects be reviewed by the State Department of Fish and Game and State Water Quality Board to determine appropriate mitigation measures.

7.18   Establishment of Buffer Zones

Buffer zones shall extend a minimum of 100 feet landward from the outermost line of wetland vegetation.  This setback may be reduced to no less than 50 feet only where:  (1) no alternative development site or design is possible; and (2) adequacy of the alternative setback to protect wetland resources is conclusively demonstrated by a professional biologist to the satisfaction of the County and the State Department of Fish and Game.  A larger setback shall be required as necessary to maintain the functional capacity of the wetland ecosystem.

7.19   Permitted Uses in Buffer Zones

Within buffer zones, permit the following uses only:  (1) uses allowed within wetlands (Policy 7.16) and (2) public trails, scenic overlooks, and agricultural uses that produce no impact on the adjacent wetlands.

7.20   Management of Pillar Point Marsh

a.   Define safe yield from the aquifer feeding the marsh as the amount of water that can be removed without adverse impacts on marsh health.

b.   Restrict groundwater extraction in the aquifer to a safe yield as determined by a hydrologic study participated in by the two public water systems (CUC and CCWD).  Water system capacity permitted and the number of building permits allowed in any calendar year shall be limited if necessary by the findings of the study.

c.   Encourage purchase by an appropriate public agency such as the Coastal Conservancy.

d.   Encourage management of the marsh to enhance the biological productivity and to maximize wildlife potential.

e.   All adjacent development shall, where feasible, contribute to the restoration of biologic productivity and habitat.

7.6

7.21    Management of Pescadero Marsh

    a.    Designate the marsh as a high priority resource management project, requiring additional governmental involvement.

    b.    Encourage the State to conduct a thorough hydrological study of the watershed with emphasis on efficient utilization of existing yields through detailed knowledge of diversions, pumping activities and flooding potential as well as existing water control structures in the marsh.  Groundwater extraction should be limited to aquifer safe yield.

    c.    Require, as a condition of permit, that the Department of Parks and Recreation develop and implement a management plan with the State Department of Fish and Game which maximizes the wildlife potential of Pescadero Marsh and permits only compatible uses.

    d.    Assist the San Mateo County Resource Conservation District in developing and implementing a soil management program to control sedimentation throughout the Pescadero/Butano watersheds with special emphasis on anadromous fish spawning and nursery areas in the upper tributaries as well as in agricultural areas adjacent to the marsh.  Base the program on the findings of the 208 Best Management Practices Program.

    e.    Permit dredging of Pescadero Creek mouth when necessary to protect the viability of the marsh and to protect Pescadero from floods.  Dredging at the creek mouth is appropriate only when there is no feasible less environmentally damaging alternative, mitigation measures have been provided to minimize adverse environmental effects, and the functional capacity of the wetland is being maintained or enhanced.

    f.    Development shall be limited to:  very minor incidental public facilities which only temporarily impact the resources of the area, wetland restoration, and nature study.

**MARINE HABITATS**

7.22    Designation of Marine and Estuarine Habitats

Designate all areas containing marine and estuarine habitats as requiring protection, specifically including but not limited to:  Fitzgerald Marine Reserve, San Gregorio Estuary, Pescadero Marsh, Pigeon Point, Franklin Point, Año Nuevo Point, and Año Nuevo Island Reserve.

7.23   <u>Permitted Uses in Marine and Estuarine Habitats</u>

In marine and estuarine habitats, permit only the following uses:  (1) nature education and research, (2) consumptive uses as provided for in the Fish and Game Code and Title 14 of the California Administrative Code, (3) fishing and (4) fish and wildlife management.

7.24   <u>Energy Development</u>

Request that offshore energy developments and require that onshore facilities for offshore oil be designed, constructed and maintained in a manner which minimizes impacts on marine habitats.

## <u>SAND DUNES</u>

7.25   <u>Designation of Sand Dune Habitats</u>

Designate the following dune areas as protected sensitive habitats:  Pescadero Point, Franklin Point, and Año Nuevo Point.  "Dune areas" are defined as those areas indicated above and delineated by both active and stabilized dunes.

7.26   <u>Permitted Uses</u>

In dune areas, permit only the following uses:  (1) education and research, and (2) trails.

7.27   <u>Development Standards</u>

a.   Prohibit any activity which alters the profile of an active dune or which results in the disturbance or removal of dune vegetation on active dunes.

b.   Control pedestrian traffic in dune areas.

c.   Prohibit all non-authorized motor vehicles from dune areas.

d.   Post signs informing recreational users not to disturb dunes or their natural vegetation.

e.   Where development is permitted, require revegetation with appropriate stabilizing species (preferably native) as a condition of permit approval.

f.   Prohibit any direct removal or excavation of sand from active dunes.

g.   Require development to locate only landward of the most seaward stabilized dune.

7.8

h.   When no feasible or practical alternative exists, permit underground utilities.

7.28   Restoration of Dunes

Encourage projects by agencies and community groups to assist in the stabilization and restoration of dunes, particularly at Año Nuevo Point and Franklin Point.

7.29   Public Acquisition

Encourage public acquisition of the dune habitat at Franklin Point.

## SEA CLIFFS

7.30   Permitted Uses

a.   Where nesting or roosting exists, permit only education and research activities.

b.   Where nesting or roosting does not exist, permit only the following uses: (1) education and research, (2) limited foot paths, (3) limited recreational rock climbing, (4) road and underground utility construction where no feasible alternative exists, and (5) intake or outfall lines provided that the habitat is not threatened.

7.31   Development Standards

a.   Restrict pedestrian traffic in bluff and cliff areas and on faces to a limited number of well-defined trails which avoid seabird nesting and roosting sites.

b.   Post signs informing recreational users not to disturb natural vegetation or nesting and roosting sites.

## RARE AND ENDANGERED SPECIES

7.32   Designation of Habitats of Rare and Endangered Species

Designate habitats of rare and endangered species to include, but not be limited to, those areas defined on the Sensitive Habitats Map for the Coastal Zone.

7.33   Permitted Uses

a.   Permit only the following uses:  (1) education and research, (2) hunting, fishing, pedestrian and equestrian trails that have no adverse impact on the

7.9

species or its habitat, and (3) fish and wildlife management to restore damaged habitats and to protect and encourage the survival of rare and endangered species.

b.   If the critical habitat has been identified by the Federal Office of Endangered Species, permit only those uses deemed compatible by the U.S. Fish and Wildlife Service in accordance with the provisions of the Endangered Species Act of 1973, as amended.

7.34   <u>Permit Conditions</u>

In addition to the conditions set forth in Policy 7.5, require, prior to permit issuance, that a qualified biologist prepare a report which defines the requirements of rare and endangered organisms.  At minimum, require the report to:

a.   Discuss:

(1)   Animal food, water, nesting or denning sites and reproduction, predation and migration requirements, and

(2)   Plants life histories and soils, climate and geographic requirements.

b.   Include a map depicting the locations of plants or animals and/or their habitats.

c.   Demonstrate that any development will not impact the functional capacity of the habitat.

d.   Recommend mitigation if development is permitted within or adjacent to identified habitats.

7.35   <u>Preservation of Critical Habitats</u>

Require preservation of all habitats of rare and endangered species using criteria including, but not limited to, Section 6325.2 (*Primary Fish and Wildlife Habitat Area Criteria*) and Section 6325.7 (*Primary Natural Vegetative Areas Criteria*) of the Resource Management Zoning District.

7.36   <u>San Francisco Garter Snake (*Thanmophis sirtalis tetrataenia*)</u>

a.   Prevent any development where there is known to be a riparian or wetland location for the San Francisco garter snake with the following exceptions: (1) existing man-made impoundments smaller than one-half acre in surface, and (2) existing man-made impoundments greater than one-half acre in surface providing mitigation measures are taken to prevent

disruption of no more than one half of the snake's known habitat in that location in accordance with recommendations from the State Department of Fish and Game.

b. Require developers to make sufficiently detailed analyses of any construction which could impair the potential or existing migration routes of the San Francisco garter snake. Such analyses will determine appropriate mitigation measures to be taken to provide for appropriate migration corridors.

7.37 San Francisco Tree Lupine Moth (*Graptholitha edwardsiana*)

Prevent the loss of any large populations (more than 100 plants in a 1/10-acre area) of tree lupine within 1 mile of the coastline.

7.38 Brackish Water Snail (*Tryonia imitator*)

a. Prevent any development which can have a deleterious effect on the California brackish water snail, including any dredging of its known or potential habitat.

b. Encourage the State Department of Parks and Recreation to manage Pescadero Marsh in such a manner as to enhance the habitat for the California brackish water snail.

7.39 Sea Otter (*Enhydra lutris nereis*)

Encourage the appropriate agency to protect, monitor, and enhance sea otter habitats. In the development of mariculture facilities, encourage appropriate State and federal agencies to seek measures to protect them from predation by the sea otter.

7.40 Globose Dune Beetle (*Coelus globosus*)

a. Assess, monitor, and contain the spread of dune grass.

b. Provide roped-off trails for public access to the beach with the explanation of the dune beetle and its surrounding habitat.

7.41 Rare Plant Search

Encourage a continued search for any rare plants known to have occurred in San Mateo County Coastal Zone but not recently seen. Such search can be done by various persons or groups concerned with such matters.

7.42    Development Standards

Prevent any development on or within 50 feet of any rare plant population. When no feasible alternative exists, permit development if: (1) the site or a significant portion thereof is returned to a natural state to allow for the reestablishment of the plant, or (2) a new site is made available for the plant to inhabit.

**UNIQUE SPECIES**

7.43    Designation of Habitats of Unique Species

Designate habitats of unique species to include, but not be limited to, those areas designated on the Sensitive Habitats Map for the Coastal Zone.

7.44    Permitted Uses

Permit only the following uses: (1) education and research, (2) hunting, fishing, pedestrian and equestrian trails that have no adverse impact on the species or its habitat, and (3) fish and wildlife management to the degree specified by existing governmental regulations.

7.45    Permit Conditions

In addition to the conditions set forth in Policy 7.5, require, as a condition of permit approval, that a qualified biologist prepare a report which defines the requirements of a unique organism. At minimum, require the report to discuss: (1) animal food, water, nesting or denning sites and reproduction, predation and migration requirements, and (2) plants life histories and soils, climate and geographic requirements.

7.46    Preservation of Habitats

Require preservation of critical habitats using criteria including, but not limited to, Section 6325.2 (*Primary Fish and Wildlife Habitat Area Criteria*) and Section 6325.7 (*Primary Natural Vegetative Areas Criteria*) of the Resource Management Zoning District.

7.47    Elephant Seal (*Mirounga angustirostris*)

a.    Encourage affected public agencies to control access to areas where elephant seals congregate.

b.    Enforce trespass laws to restrict access to areas where elephant seals congregate especially during mating, breeding, and molting season.

7.12

7.48    Monterey Pine (*Pinus radiata*)

a.    Require any development to keep to a minimum the number of native Monterey pine cut in the natural pine habitat near the San Mateo-Santa Cruz County line.

b.    Allow the commercial cutting of Monterey pine if it:  (1) perpetuates the long-term viability of stands, (2) prevents environmental degradation, and (3) protects the viewshed within the Cabrillo Highway Scenic Corridor.

c.    To preserve the productivity of prime agricultural soils, encourage the control of invasive Monterey pine onto the soils.

7.49    California Wild Strawberry (*Fragaria californica*)

Require any development, within one-half mile of the coast, to mitigate against the destruction of any California wild strawberry in one of the following ways:

a.    Prevent any development, trampling, or other destructive activity which would destroy the plant; or

b.    After determining specifically if the plants involved are of particular value, successfully transplant them or have them successfully transplanted to some other suitable site.  Determination of the importance of the plants can only be made by a professional doing work in strawberry breeding.

7.50    Champion Monterey Cypress (*Cupressus macrocarpa*)

Declare the Champion Monterey Cypress Tree a Class I Heritage Tree.

**WEEDY, UNDESIRABLE PLANTS**

7.51    Voluntary Cooperation

Encourage the voluntary cooperation of private landowners to remove from their lands the undesirable pampas grass, French, Scotch and other invasive brooms. Similarly, encourage landowners to remove blue gum seedlings to prevent their spread.

7.52    Public Agency Requirements

Require public agencies, to the point feasible, to remove the undesirable pampas grass and French, Scotch, and other invasive brooms from their lands.

7.53    <u>Sale Prevention</u>

Encourage the voluntary cooperation of the County's retail nursery trade to prevent the sale of undesirable pampas grass and French, Scotch, and other invasive brooms in the County.

7.54    <u>Weedy Thistle Eradication</u>

Encourage farmers to eradicate weedy thistle, particularly from land adjacent to artichoke fields.  Encourage the Agricultural Commissioner to support eradicative procedures in cooperation with the Farm Advisor, local farmers, the State Department of Beaches and Parks, CalTrans, and the State Department of Food and Agriculture.

# EXHIBIT B

# COUNTY OF SAN MATEO | PLANNING AND BUILDING DEPARTMENT
# MONTECITO RIPARIAN CORRIDOR
## EL GRANADA AREA (APN PREFIX: O47)



**Legend:**
- Montecito Riparian Corridor Boundary
- Montecito Riparian Corridor
- Perennial Riparian Buffer (5O FT)
- Vacant Parcel
- Developed Parcel
- County Parcels

Note: This map illustrates the approximate boundary of the Montecito Riparian Corridor based on aerial photographs taken in 2006. The County of San Mateo Local Coastal Program categorizes riparian corridors as environmentally sensitive habitat areas, and strictly regulates development within and adjacent to such areas. Site specific boundary surveys, riparian buffer delineations and biological studies, as well as other infomration will be required to determine what if any development may be permissible on parcels wihtin these areas.